OPINION
{¶ 1} Appellant, State of Ohio, appeals from the trial court's judgment granting in part appellee Robert O'Keefe's Crim.R. 29 motion and various evidentiary rulings made during the trial of this matter. We affirm in part and reverse in part.
 {¶ 2} Appellee was a detective with the Ashtabula County sheriff's office. He and his wife Kathleen had been married for approximately thirty-two years when Mrs. O'Keefe began having an affair with Kevin Holko.
 {¶ 3} Mrs. O'Keefe arranged via e-mail to meet Holko at the Fairfield Inn, in Warren, Ohio on the afternoon of October 23, 2001. Appellee discovered the e-mail and went to the Fairfield Inn.
 {¶ 4} While in the hotel room with Holko, Mrs. O'Keefe received a call from the desk clerk, stating Mrs. O'Keefe's car had been hit in the parking lot. Mrs. O'Keefe and Holko dressed and went downstairs. Appellee was waiting at the bottom of the stairs. He grabbed Holko and punched him repeatedly. Appellee then told his wife she was coming with him. Mrs. O'Keefe said that she did not want to.
 {¶ 5} After Mrs. O'Keefe retrieved her belongings from the hotel room, she and appellee returned to their Williamsfield, Ohio home. During the ride home, appellee berated and threatened Mrs. O'Keefe. He stated he would kill her and Holko but wanted her first to suffer for her adultery.
 {¶ 6} When she arrived home, Mrs. O'Keefe grabbed a telephone and called 911. Appellee ripped the telephone off the wall. Mrs. O'Keefe did not think the call went through, however it did and the 911 dispatcher called the house. Appellee answered and told the dispatcher everything was fine and he was just having an argument. The dispatcher sent Detective Brian Hubbard to ensure there was no problem.
 {¶ 7} When Detective Hubbard arrived, appellee ordered his wife, who was naked, to sit in a recliner and not to move. Appellee then met Detective Hubbard in the drive. Appellee told Detective Hubbard he had ripped the telephone cord out of the wall because he had just beaten up someone in Warren and he was expecting a telephone call or for Warren police to come to his house. Appellee told Detective Hubbard everything was fine and Detective Hubbard left.
 {¶ 8} Appellee continued to berate and threaten his wife. At approximately 10:00 p.m., he stated he was going to move out and left the house. Appellee went to the home of his friend Doug Shilling. Shilling accompanied appellee to Warren to retrieve Mrs. O'Keefe's car. Appellee then returned home and continued to berate his wife. After awhile appellee began to calm down and became apologetic. He and Mrs. O'Keefe then went to sleep.
 {¶ 9} When appellee awoke on the morning of October 24, 2001, his hand was hurting and swollen. He left to go to the emergency room to have his hand checked. He returned home at approximately 12:30 p.m. and Mrs. O'Keefe was napping. Appellee entered the bedroom and ripped the covers and nightgown off Mrs. O'Keefe. He took the belt from his pants and proceeded to beat Mrs. O'Keefe repeatedly while calling her a "whore." Appellee beat her intermittently over a period of two hours.
 {¶ 10} Appellee then made Mrs. O'Keefe, who was naked, leave the house. Thinking better of it, appellee chased her down and dragged her back into the house. He then beat her with the belt for twenty or thirty minutes.
 {¶ 11} Appellee eventually calmed down and inquired as to why Mrs. O'Keefe had not cooked his meal. Mrs. O'Keefe then made a meal and took a shower. Mrs. O'Keefe left for work after eating dinner with appellee.
 {¶ 12} Appellee called his wife twice while she was at work. The first time he repeatedly apologized for his behavior. He told Mrs. O'Keefe he had written a confession and would turn himself in to sheriff's deputies. During the second conversation, he said he was going hunting, that he loved her, and wanted to work things out.
 {¶ 13} Mrs. O'Keefe returned home the morning of October 25, 2001 after completing her shift and went to sleep in a basement bedroom.
 {¶ 14} Appellee eventually returned home. He entered the bedroom and proceeded to beat Mrs. O'Keefe with a narrow alternator belt for about ten minutes. After beating his wife, appellee got a long screwdriver and began to poke Mrs. O'Keefe's pubic area with it. Appellee then beat her again with the alternator belt.
 {¶ 15} Appellee next took Mrs. O'Keefe to the garage where he photographed her injuries. He stated he would send the pictures to Holko's wife.
 {¶ 16} The two returned to the house and appellee again beat Mrs. O'Keefe with the alternator belt.
 {¶ 17} After he calmed down, appellee retrieved his service handgun and put the barrel in his mouth. He then told Mrs. O'Keefe to pull the trigger. She refused to do so. Appellee then said he would get drunk enough to do it himself and began drinking whiskey. He took the whiskey and his handgun and told Mrs. O'Keefe he was going to be on their property and left the house.
 {¶ 18} Mrs. O'Keefe, fearing appellee would kill himself, or return and kill her, called 911. Sheriff's deputies arrived at the property and, using a police dog, tracked appellee to a shack on the property.
 {¶ 19} Deputy Niemi approached the shack and saw appellee sitting against a wall holding his service handgun to his head. Other sheriff's personnel arrived and tried to convince appellee to put down the weapon.
 {¶ 20} During the standoff, appellee removed the magazine from the handgun, showed those present it was loaded, re-inserted the magazine, and racked the slide to chamber a round. Sheriff's deputies continued to try to convince appellee to surrender the weapon. Appellee continued to move the handgun from the side of his head to his mouth and to his chin. Appellee also continued to fill a water glass with whiskey and sip it. Eventually Deputy Bryan Rose, a close friend of appellee's, arrived at the scene, as did Lieutenant Bernardo.
 {¶ 21} During the standoff, appellee's mood would go up and down. He would be irate and screaming and then calm down. Appellee repeatedly called the sheriff a crook and a liar as deputies tried to convince appellee to surrender.
 {¶ 22} At one point Deputy Niemi was in the shack with appellee while Lieutenant Bernardo and Sergeant Leonhard stood shoulder to shoulder in the doorway. Appellee asked the lieutenant what he thought of Detective Hubbard. The lieutenant replied, "Depends on what he's doing." This response angered appellee. Appellee swore at Lieutenant Bernardo, took the weapon from his head, swept it across Deputy Niemi's chest, passed Sergeant Leonhard, and pointed it at Lieutenant Bernardo for a period of a few seconds. Deputy Niemi started to draw his handgun and Lieutenant Bernardo and Sergeant Leonhard dove for cover. Appellee then returned the weapon to his head.
 {¶ 23} Eventually Deputy Niemi was able to disarm appellee as appellee repositioned the handgun and appellee's finger was off the trigger. Deputies then assisted appellee to a nearby cruiser. Appellee was handcuffed and transported to jail. After deputies secured appellee's handgun it was found to have a live round in the chamber.
 {¶ 24} After giving a statement to deputies, Mrs. O'Keefe went to the emergency room for treatment of her injuries. Mrs. O'Keefe later gave a videotaped statement to deputies.
 {¶ 25} Appellee was indicted on seven counts: (1) kidnapping, R.C. 2905.01(A)(3), a first degree felony; (2) attempted rape, R.C. 2903.02 and 2907.02(A)(2), a second degree felony; (3) kidnapping, R.C. 2905.01(A)(3), a first degree felony; (4) felonious assault, R.C. 2903.11(A)(2), a second degree felony; (5) felonious assault with firearm specification, R.C.2903.11(A)(2), a first degree felony; (6) felonious assault with firearm specification, R.C. 2903.11(A)(2), a first degree felony; and (7) felonious assault with firearm specification, R.C.2903.11(A)(2), a first degree felony. The last three charges stemmed from appellee's act of pointing his handgun at the officers.
 {¶ 26} The matter proceeded to jury trial. At the close of the state's case, appellee made a Crim.R. 29 motion for acquittal as to all counts. The trial court granted appellee's motion with respect to counts five, six, and seven, and the matter proceeded on counts one, two, three, and four of the indictment. At the conclusion of trial, the jury returned a verdict finding appellee not guilty on counts one and two, but guilty on counts three and four. Following a hearing, the trial court sentenced appellee to serve a term of three years on count three (kidnapping) and two years on count four (felonious assault) with the sentences to run concurrently.
 {¶ 27} We granted, in part, the state's motion for leave to appeal. The state raises four assignments of error for our review:
 {¶ 28} "[1.] The trial court erred when it granted, in part, defendant's motion for acquittal, pursuant to Crim.R. 29, effectively removing from the jury's consideration three counts of the indictment.
 {¶ 29} "[2.] The trial court improperly precluded the state of Ohio from presenting evidence as to an essential element of the offense of felonious assault.
 {¶ 30} "[3.] The trial court erred when it improperly admitted defendant's psychological evaluation.
 {¶ 31} "[4.] The trial court erred when it refused to permit the state of Ohio to reopen the victim's testimony to rebut certain statements in the improperly admitted psychological evaluation, and therefore the state's motion for mistrial should have been granted."
 {¶ 32} In its first assignment of error, the state contends the trial court erred when it granted appellee's Crim.R. 29 motion with respect to the counts of felonious assault stemming from appellee's act of sweeping his handgun across Deputy Niemi's chest, passed Sergeant Leonhard, and pointing it at Lieutenant Bernardo.
 {¶ 33} The state first argues the trial court applied the wrong standard in analyzing appellee's Crim.R. 29 motions. The state then argues that the act of pointing a loaded weapon, coupled with an indirect threat, is sufficient evidence to prove each element of the offense of felonious assault. Because the state's arguments are intertwined, we address them together.
 {¶ 34} The standard applied when ruling on a Crim.R. 29 motion is "`* * * whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Williams (1996),74 Ohio St.3d 569, 576, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 35} R.C. 2903.11 provides:
 {¶ 36} "(A) No person shall knowingly do either of the following:
 {¶ 37} "(1) * * *
 {¶ 38} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 39} The issue in the instant case is whether the state presented sufficient evidence from which a rational jury could have concluded that appellee "attempted to cause" physical harm to the officers when he pointed his handgun at them.
 {¶ 40} The Revised Code defines attempt as follows, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).
 {¶ 41} In State v. Brooks (1989), 44 Ohio St.3d 185, the Ohio Supreme Court held:
 {¶ 42} "The act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient evidence to convict a defendant of the offense of `felonious assault' as defined by R.C. 2903.11(A)(2).'" Id. at syllabus.
 {¶ 43} In Brooks, the Court found the lower court erred in concluding as a matter of law that the state failed to present sufficient evidence from which a rational jury could conclude the defendant had violated R.C. 2903.11(A)(2). Id. at 192. In support of its conclusion, the Ohio Supreme Court stated:
 {¶ 44} "We recognize * * * that experience has demonstrated that many homicides and serious assaults occur in the heat of impassioned arguments. In the case at hand, Barker testified that she and the defendant became embroiled in a volatile argument. She stated that the defendant suddenly drew a revolver and angrily told her that he would kill her. She further stated that the defendant left the bar only when the manager appeared to be summoning the police.
 {¶ 45} "Under these circumstances, we cannot say that a reasonable jury properly instructed could not have concluded that the defendant's actions were `strongly corroborative' of his intent to cause physical harm to Barker by means of his deadly weapon." Id.
 {¶ 46} In State v. Green (1991), 58 Ohio St.3d 239, the Ohio Supreme Court, applying Brooks held that, "The act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use such weapon, is sufficient evidence to convict a defendant of the offense of `felonious assault' as defined by R.C. 2903.11(A)(2)." Id. at syllabus.
 {¶ 47} The Green Court held that the additional evidence needed to support a felonious assault charge could include a verbal threat as perceived by a reasonable person under the circumstances. Id. at 241. The Court concluded:
 {¶ 48} "In the case sub judice, defendant held a rifle aimed at Mongold's head. The rifle was loaded, the hammer was cocked, and the weapon was subsequently determined to be a fully functional firearm. Moreover, at the instant defendant positioned his weapon in the direction of the officers, he shouted, `If you don't have a warrant get the fuck out of my house.' Clearly, under these circumstances a reasonable jury, properly instructed, could have concluded that defendant's actions were strongly corroborative of his intent to cause physical harm to the officers by means of his deadly weapon." Id. at 241-242.
 {¶ 49} In the instant case, the state points to evidence that appellee demonstrated to the officers that his handgun was loaded and stated, "Now I can do what I need to do." The state relies on the following testimony of Deputy Niemi:
 {¶ 50} "A. * * * When Lieutenant Bernardo told him that answer, `Depends on what he was doing', that enraged [appellee.] He took the gun that he was holding up to the side of his head, and he brought it out and right across and pointed it at him, at Sergeant Leonhard and Lieutenant Bernardo."
 {¶ 51} "* * *
 {¶ 52} "Q. When you say he pointed it at him, how did he do that exactly?
 {¶ 53} "A. Brought it, locked his arm out, brought it across, and pointed it right at him."
 {¶ 54} The state then points to evidence of the reaction of the officers to these developments. Lieutenant Bernardo and Sergeant Leonhard testified they dove for cover; fearing appellee would fire the weapon.
 {¶ 55} The state next directs us to the testimony of Deputy Bryan Rose. Deputy Rose testified:
 {¶ 56} "A. [Appellee] was talking to Lieutenant Bernardo. He turned to Lieutenant Bernardo and asked about Deputy Brian Hubbard. He asked the question, `Is Deputy Brian Hubbard a good cop', and the Lieutenant answered, `It depends on what he's doing.' And with that, [appellee] had the gun up by his head, looked over at him, called him a smart ass. He called him a smart ass, motherfucker, stuck the gun out, and pointed it right out at Lieutenant Bernardo. The gun went across Deputy Niemi's chest because he was off to my side, toward officer Greg Leonhard, and finally resting straight at Lieutenant Bernardo."
 {¶ 57} Lieutenant Bernardo testified:
 {¶ 58} "A. * * * At that response, he just became enraged. He had the gun to his head like this. From his position, Sergeant Leonhard and myself would be to his right but on a slight angle. He had the gun to his face. I saw this look come over his face like I never seen, like an evil rage. And he just took the weapon, and he pointed it straight at me and Sergeant Leonhard."
 {¶ 59} The record demonstrates the state failed to present sufficient evidence to sustain a conviction of felonious assault with respect to appellee sweeping the handgun across Deputy Niemi and Sergeant Leonhard. Appellee made no threat, direct or indirect, against these officers. It is clear that appellee directed his anger at Lieutenant Bernardo in reaction to the lieutenant's response to appellee's question.
 {¶ 60} Viewing the evidence in the light most favorable to the state, we conclude the state presented sufficient evidence to survive appellee's Crim.R. 29 motion with respect to the charge of felonious assault stemming from appellee's pointing of the handgun at Lieutenant Bernardo. Based on the totality of the circumstances, i.e, appellee's action of pointing the loaded firearm at Lieutenant Bernardo while swearing at him, and appellee's reaction of diving for cover, create a jury question as to whether appellee attempted to cause physical harm to Lieutenant Bernardo. See, Green, supra.
 {¶ 61} We agree with the trial court that the state failed to present sufficient evidence from which a rational jury could conclude that appellee attempted to cause physical harm to Deputy Niemi and Sergeant Leonhard because there was insufficient evidence of any threat or other corroborative evidence of appellee's intention; however, the trial court erred in granting appellee's Crim.R. 29 motion with respect to the count five felonious assault charge stemming from appellee's actions against Lieutenant Bernardo. Appellant's first assignment of error is sustained in part.
 {¶ 62} In its second assignment of error, the state contends the trial court erred in precluding Mrs. O'Keefe from testifying about the severity of her injuries and the length of time it took her to recover from those injuries. The state argues that by precluding this testimony, the trial court prevented the state from presenting evidence as to an essential elemental of the felonious assault charge, i.e., serious physical harm.
 {¶ 63} We review a trial court's decision to admit or exclude evidence only for an abuse of discretion. State v. Slagel
(1992), 65 Ohio St.3d 597, 601. "Abuse of discretion" means more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157-158, citing Steiner v. Custer
(1940), 137 Ohio St. 448; Conner v. Conner (1959),170 Ohio St. 85.
 {¶ 64} Here, the state contends it should have been permitted to elicit the disputed evidence to establish the element of "serious physical harm." However, appellee was indicted under R.C. 2903.11(A)(2). This section requires only that the state prove "physical harm" rather than "serious physical harm" as in R.C. 2903.11(A)(1).[1] "Physical harm" means "* * * any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).
 {¶ 65} The trial court permitted Mrs. O'Keefe to testify regarding the injuries she suffered and only precluded her testimony regarding the severity of her injuries and the amount of time it took her to recover from those injuries. Because the excluded testimony was not relevant to establishing any element of the offense with which appellee was charged, we cannot say the trial court abused its discretion in excluding the evidence. Appellee's second assignment of error is without merit.
 {¶ 66} In its third assignment of error, the state argues the trial court erred in permitting testimony regarding a psychological evaluation of appellee. This report was prepared at the request of the sheriff's office some ten months before the events at issue in this case. The state frames the issue presented in this assignment of error as, "Admission of a report containing the diagnosis or opinion of a physician other than the witness testifying is not permitted."
 {¶ 67} During cross-examination of Lieutenant Bernardo, appellee's counsel asked the witness whether he recalled recommendations made in the psychological evaluation. Lieutenant Bernardo testified he could not recall the recommendations. Defense counsel then asked the witness to review the report. Defense counsel then asked the witness if the sheriff's department implemented the recommendations. The witness asked to which recommendation defense counsel was referring. Defense counsel responded, "Was the department encouraged to give Detective O'Keefe consistent encouragement not to give up on a medical approach that could help [his] health problems?" The lieutenant responded that he did not believe it was the department's responsibility.
 {¶ 68} On re-direct, the state sought to question Lieutenant Bernardo regarding other portions of the report. The trial court eventually stated the report would either be admitted into evidence or read to the jury.
 {¶ 69} The state initially objected that appellee was trying to introduce the psychological report without calling the doctor who prepared the report as a witness, i.e., that the defense sought to introduce inadmissible hearsay evidence. We disagree.
 {¶ 70} Evid.R. 612 states:
 {¶ 71} "Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1)(d) of Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion witheld [sic.] over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial."
 {¶ 72} In the instant case, the record makes clear that appellee's counsel initially used the report to refresh the witness's recollection pursuant to Evid.R. 612. Appellee's counsel sought to question Lieutenant Bernardo regarding recommendations made by the report about appellee's health problems.[2] Lieutenant Bernardo testified he could not recall the report's recommendations. Appellee's counsel then had the lieutenant review the report silently to refresh his recollection. Appellee's counsel then questioned whether the sheriff's department had implemented the recommendations. Because, as discussed infra, the report was not being used as substantive evidence, the trial court did not abuse its discretion in permitting appellee's counsel to use the report to refresh the witness's recollection.
 {¶ 73} The state also objected to the use of the report to refresh the witness's recollection. The state argued that because Lieutenant Bernardo had not prepared the report, the defense could not use it to refresh his recollection. We disagree.
 {¶ 74} Lieutenant Bernardo testified he had read the report. Thus, it could be used to refresh his recollection of what recommendations had been made so that he could testify as to whether the sheriff's department had followed those recommendations. Evid.R. 612 does not require that the witness have prepared the document used to refresh his recollection. Weissenberger, Ohio Evidence (2004), 312, Section 612.3. It is also important to remember that a writing used to refresh a witness's recollection is not being offered as substantive evidence, thus appellee was not required to lay the foundation of admissibility, nor were the rules of hearsay applicable. See,Dayton v. Combs (1993), 94 Ohio App.3d 291, 296; State v.Sanders (1998), 130 Ohio App.3d 789, 803, (Christley, J., dissenting). The substantive evidence was the lieutenant's testimony based on his refreshed recollection.
 {¶ 75} After Lieutenant Bernardo provided evasive answers as to whether the sheriff's department had implemented the recommendations, appellee's counsel stated, "[a]nd was that a recommendation that he should be given consistent encouragement not to give up on a medical approach found that would help him? Did I correctly state it?" In this instance, appellee's counsel improperly read from the report. However, the state failed to object, so this argument is waived. State v. Stackhouse, 11th Dist. No. 2002-P-0057, 2003-Ohio-1980, ¶ 19, citing State v.Williams (1977), 51 Ohio St.2d 112.
 {¶ 76} On re-direct, the state attempted to have the lieutenant read a paragraph from the report. Appellee's counsel objected to reading the report to the jury. The trial court overruled the objection. After further testimony from Lieutenant Bernardo as to portions of the report, the trial court stated that report should either be read to the jury in its entirety or admitted as an exhibit. Appellee then moved to introduce the report as an exhibit. The state then moved to have the witness read the exhibit. The trial court permitted the witness to read the report to the jury. Therefore, the state invited any error in reading the report to the jury, and may not now be heard to object on appeal. State v. Bey, 85 Ohio St.3d 487, 493,1999-Ohio-283, (stating, "Under the invited-error doctrine, `[a] party will not be permitted to take advantage of an error which he himself invited or induced.' Hal Artz Lincoln-Mercury, Inc.v. Ford Motor Co. (1986), 28 Ohio St.3d 20, 28 OBR 83,502 N.E.2d 590, paragraph one of the syllabus; State v. Seiber
(1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422.")
 {¶ 77} The state also argues the trial court improperly prohibited the state from rehabilitating Lieutenant Bernardo on re-direct. The record shows the trial court permitted the state to question the witness about other portions of the report to add context to the witness's testimony. Thus, we cannot conclude the trial court improperly limited the state's re-direct examination of the witness.
 {¶ 78} In sum, the trial court did not abuse its discretion in permitting appellee's counsel to use the psychological report to refresh the witness's recollection and the state waived any error with respect to appellee's counsel reading from the report and invited any error with respect to reading the report to the jury. Appellant's third assignment of error is without merit.
 {¶ 79} In its fourth assignment of error, the state first argues the trial court erred when it refused to allow the state to re-open its case. The state sought to have Mrs. O'Keefe testify to rebut information presented to the jury through the psychological evaluation. The state also argues the trial court should have granted its motion for a mistrial because the psychological report was improperly admitted and the state was denied the opportunity to re-open its case to rebut the evidence contained in the psychological report.
 {¶ 80} The predicate for the state's fourth assignment of error is the alleged impropriety of the trial court's admission of evidence from the psychological report. Our disposition of the state's third assignment of error renders this assignment of error moot.
 {¶ 81} In conclusion, we reverse the trial court's judgment with respect to its grant of appellee's Crim.R. 29 motion as to the charge of felonious assault stemming from appellee's actions against Lieutenant Bernardo; appellant's remaining assignments of error are without merit. For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed in part and reversed in part.
Grendell, J., Nader, J., Ret., Eleventh Appellate District, sitting by assignment, concur.
[1] R.C. 2903.11(A)(1) provides, "No person shall knowingly * * * cause serious physical harm to another * * *." (Emphasis added.)
[2] Appellee sought to introduce this evidence to demonstrate appellee was despondent over, among other things, his health problems. Appellee introduced this evidence to refute the state's contention that appellee intended anything other than suicide while in the shack, i.e., to rebut the three counts of felonious assault. Thus, this evidence was relevant.