DECISION.
{¶ 1} Defendant-appellant Anthony Little appeals his convictions for attempted murder and two counts of felonious assault. A jury found Little guilty of the three offenses and of two firearm specifications. The trial court sentenced him to the maximum of 21 years in prison. We affirm.
 I. A Shooting in the Night {¶ 2} Around 1:00 in the morning on August 31, 2002, Timothy Grant was knocking on his girlfriend's front door. A van drove by and honked at him. Grant approached the van and saw Little, Little's brother Kenny, and one other person.
 {¶ 3} Little asked Grant if he knew where Philip Billingsley, Grant's cousin, lived. Grant asked Little for a ride and said that he would show Little where Billingsley lived. The van stopped at Billingsley's house, and Little and Grant approached the front door.
 {¶ 4} Grant testified that he rang the doorbell and Billingsley came to the door. Grant told his cousin, "Phil, these guys want some drugs," and Little said, "[Y]eah, I need some drugs." According to Grant, he was suddenly pushed to the left and Little started shooting at Billingsley. As soon as the shooting began, Grant ran off.
 {¶ 5} Billingsley testified that late that night his doorbell rang, and he heard Grant say, "[C]uz, it's me, open the door." Billingsley turned the porch light on and opened the door. Billingsley testified that he saw Grant and someone he did not know standing to Grant's right. According to Billingsley, Grant asked him if he had forty dollars worth of crack cocaine, but before he could respond, Grant was pushed to the side and the other man began shooting a gun at him.
 {¶ 6} Billingsley testified that he saw the face of the man who shot him. Billingsley was shot two times in the head and fell to the ground. While on the ground, he was shot again in the stomach. Billingsley testified that one of the shots to his head caused him to lose his right eye. The shot to the stomach caused him to need a colostomy bag for seven months, and the bullet remains lodged in his spine. Billingsley testified that he was in the hospital for twelve days after the shooting.
 {¶ 7} While he was in the hospital, police showed Billingsley a photo lineup. Billingsley identified Little as the man who had shot him. Billingsley testified that about three weeks before the shooting, he had a fight with Little's brother Dale over drugs.
 {¶ 8} Little's only witness was Lois Brown, his girlfriend. Brown testified that Little was with her in her home the entire night of the shooting.
 II. Alibi Impeachment {¶ 9} Little asserts three assignments of error. In his first assignment, he argues that the trial court improperly allowed the state to impeach Little's alibi witness with a conviction that was over ten years old.
 {¶ 10} A witness may be impeached by evidence of a conviction, "if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice of confusion of the issues, or of misleading the jury."[1]
 {¶ 11} But there are time limits on the use of a prior conviction to impeach. "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, or the termination of probation, or shock probation, or parole, or shock parole imposed for the conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."[2]
 {¶ 12} Little argues that it was improper for the state to use Lois Brown's 1991 conviction for endangering children[3] to impeach her, because the conviction was more than ten years old. Little also contends that the trial court did not make the necessary determination regarding the probative value of the conviction, and that the state did not give him written notice of its intent to use it at trial.
 {¶ 13} The following exchange occurred during Brown's testimony:
 {¶ 14} "Q. Ms. Brown, my name is Bradley Greenberg. I'm the prosecutor on this case. I met you in the hall earlier today, correct?
 {¶ 15} "A. Yes.
 {¶ 16} "Q. And I had asked you like two questions, didn't I?
 {¶ 17} "A. You asked me about my Social.
 {¶ 18} "Q. Social Security number?
 {¶ 19} "A. Yes.
 {¶ 20} "Q. Correct?
 {¶ 21} "A. Yes.
 {¶ 22} "Q. And I asked you if you had a record, didn't I?
 {¶ 23} "A. I don't remember that. I don't recall that.
 {¶ 24} "Mr. Freeman: Objection, your honor, to the form of the question.
 {¶ 25} "A. I don't recall it.
 {¶ 26} "The Court: Overruled.
 {¶ 27} "Q. You don't recall me telling you that I asked for your Social Security number to see if you have a record?
 {¶ 28} "A. Okay. I don't have a record. I'm not on paper or nothing like that.
 {¶ 29} "Q. You don't have any record, any criminal record?
 {¶ 30} "A. What is you referring to? What are you saying?
 {¶ 31} "Q. Well, within the last — isn't it true you told me out in the hall that you don't have a record?
 {¶ 32} "A. I don't have. I mean, what is you telling me? What are you referring to? I'm confused. I don't think I understand the question.
 {¶ 33} "Q. The question is, in the hall with your lawyer right there, he was wasn't he?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. I was standing right next to your lawyer and I asked you your Social Security number, correct?
 {¶ 36} "A. Yes. Yes.
 {¶ 37} "Q. And I told you that I am asking you because I want to run your record?
 {¶ 38} "A. Okay. I don't understand what you mean. I'm not on probation or parole or nothing.
 {¶ 39} "Mr. Freeman: Judge, I'll object.
 {¶ 40} "The Court: Sustained.
 {¶ 41} "Q. Isn't it true that —
 {¶ 42} "Mr. Freeman: Same objection.
 {¶ 43} "Q. Isn't it true that within the last ten years, you were on probation for a felony?
 {¶ 44} "A. No. I don't know what you talking about. Unless you, I mean, I don't know what you're talking about ten years ago what happened.
 {¶ 45} "Q. Isn't it true that you were convicted for torturing or abusing a child in 1991 and given three years' probation?
 {¶ 46} "A. You talking about the flooding of the toilet, the flooding of the toilet they said the other room where the guy went by the —
 {¶ 47} "Mr. Freeman: Ma'am — Judge, I am going to object.
 {¶ 48} "Mr. Greenberg: Rule 609.
 {¶ 49} "The Court: Counsel, approach."
 {¶ 50} (The following transpired at a sidebar conference.)
 {¶ 51} "The Court: Mr. Freeman, state your objection.
 {¶ 52} "Mr. Freeman: Judge, there's a conviction that goes back previous to ten years and —
 {¶ 53} "Mr. Greenberg: Judge, Rule 609(B) states if they were on probation for the last ten years — and I have a record right here, 1991, three-year probation for torturing or abusing a child. I showed that to Mr. Freeman.
 {¶ 54} "Mr. Freeman: It is your call.
 {¶ 55} "The Court: Well, I'll overrule the question that you have asked.
 {¶ 56} "Mr. Freeman: Okay."
 {¶ 57} (Ends discussion at sidebar.)
 {¶ 58} "The Court: Mr. Greenberg.
 {¶ 59} "Q. Ms. Brown, I'll ask you again. Isn't it true that in 1991, you were convicted of a felony offense for torturing or abusing a child and given three years of probation?
 {¶ 60} "A. My son flooded the toilet. The water went into the living room where the VCR and the TV was at. They considered my child to be, if the water — they said he could have gotten electrocuted, that's what the fire department said. Now that was back in '91. Now 2003. God has forgiven me. Jesus has forgiven me. The courts have forgiven me for letting him flood the toilet. Why are you — why is that important? That was over 13 years. He's a grown man now and nothing is wrong with him.
 {¶ 61} "Q. You were convicted, though, were you not?
 {¶ 62} "A. The courts let that go, sir. I mean, my son, he flooded the toilet. I wasn't even the cause of it happening. He caused it to happen.
 {¶ 63} "Q. Were you convicted or were you not convicted?
 {¶ 64} "A. It just —
 {¶ 65} "Mr. Freeman: Your Honor, we will stipulate that she has a 1991 felony conviction as explained by the witness pursuant to Mr. Greenberg's own question.
 {¶ 66} "A. Jesus.
 {¶ 67} "The Court: Sustained. Mr. Greenberg, move on.
 {¶ 68} "Q. Isn't it true that out in the hall you told me that you had no record?
 {¶ 69} "A. Sir, I explained it to you. Can we get to the next question, please?
 {¶ 70} "Q. Isn't it true that out in the hall you told me that you had no record?
 {¶ 71} "A. You was asking about the Social Security card, I mean, Social Security number. You did not stress it out in the hallway in front of the lawyer. What have you ever done or happened in your life years ago, you never stressed that question to me, no, you didn't."
 {¶ 72} While Brown's criminal record is not part of the record before us, the state had Brown's criminal record available at trial. This was necessary under DR 7-106(C)(2), because a lawyer cannot ask whether a witness has a prior conviction unless the lawyer has evidence that the answer is yes.
 {¶ 73} We are also troubled that the prosecutor continued his line of questioning after the trial court quite properly told him to "move on" — just a word of caution for the future.
 {¶ 74} While we question the effectiveness of the state's attempt to impeach Brown with her prior conviction, we conclude that there was no error committed. According to the state, Brown's probation terminated in 1994. Under the time limits of the evidence rule, the conviction was admissible. Therefore, the state was properly allowed to impeach Brown with the conviction and was not required to give written notice to Little of its intent to use the conviction at trial.
 {¶ 75} Accordingly, we overrule Little's first assignment of error.
 III. Alleged Prosecutorial Misconduct {¶ 76} In his second assignment of error, Little argues that the state committed two acts of prosecutorial misconduct. Little contends that first, in the state's closing remarks, the prosecutor personally vouched for the credibility of the state's witnesses and implied that Little's witness was a liar. Second, Little argues that the prosecutor improperly stated that Brown's prior conviction was for "torturing a child."
 {¶ 77} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.[4] The prosecution has wide latitude in its closing remarks as to what the evidence has shown and what reasonable inferences may be drawn.[5] Prosecutors may comment upon the testimony of witnesses and suggest the conclusions to be drawn from it,[6] but they may not express their personal beliefs or opinions regarding the defendant's guilt or witnesses' credibility.[7]
 {¶ 78} We must view the closing argument in its entirety when determining prejudice.[8] The improper conduct of the prosecutor at trial does not give rise to prejudicial error unless the conduct deprives the defendant of a fair trial.[9]
 {¶ 79} In his closing argument, the prosecutor stated the following: "Both Timothy Grant and Philip Billingsley were forthright that they did have criminal records, that they were in prison before, that involved drugs. They admitted that they were convicted and that they served time. On the other hand, the witness you heard from, the alibi witness, Lois Brown, she was evasive when I asked her about her record, and I suggest to you that if you think a person would be found guilty of felony child endangering because of a flooded toilet, I would suggest that I have a bridge that you might be interested in buying. She was not credible in her testimony at all."
 {¶ 80} The prosecutor later stated, "Their alibi witness sounded like a broken record. She didn't know anything about anything except she knew that that weekend, August 31st he was with her. He just happened to come that Friday night and he was there. Well, she has a clear reason to lie in this case. She has a child with this defendant. She's got a history with him, she's got a reason to lie. As I said, people, normally, if they lie, they lie when it is in their self-interests. She has a reason, a motivation of self-interest to lie, unlike the State's witnesses."
 {¶ 81} And during Brown's testimony, the prosecutor asked, "Isn't it true that you were convicted for torturing or abusing a child in 1991 and given three years' probation?"
 {¶ 82} Little's trial counsel did not object to any of the prosecution's closing remarks or to the characterization of Brown's conviction during her testimony. Little has therefore waived all but plain error.[10] And prosecutorial misconduct constitutes plain error only if it is clear that the defendant would not have been convicted absent the improper comments.[11]
 {¶ 83} The prosecutor's remarks on credibility were comments on the truthfulness and credibility of the witnesses based on their testimony. This was proper and we conclude that the state committed no error in this respect.
 {¶ 84} As to the remarks about Brown's prior conviction, they were improper. Brown's conviction was for endangering children, an offense that prohibits abuse, torture, excessive punishment, and other acts against children.[12] While the prosecutor's characterization of her conviction was overstated and misleading — and relied on facts clearly not in evidence — it is not clear that, absent the improper characterization, Little would have been acquitted. Therefore, no plain error occurred.
 {¶ 85} Accordingly, we overrule Little's second assignment of error.
 IV. Manifest Weight {¶ 86} In his third assignment of error, Little argues that his convictions were against the manifest weight of the evidence. A challenge to the weight of the evidence attacks the credibility of the evidence presented.[13] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[14]
The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[15]
 {¶ 87} The state presented two witnesses who identified Little as the man who had shot Billingsley. Little presented an alibi witness who testified that he was home with her the entire night of the shooting. The credibility of the witnesses was the province of the jury. The jury was free to believe some, all, or none of a particular witness's testimony. The mere presence of conflicting testimony did not mean that Little's conviction was against the manifest weight of the evidence.
 {¶ 88} Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Little guilty of attempted murder and felonious assault. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 89} Accordingly, we overrule Little's third assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., and Hildebrandt, J., concur.
[1] Evid.R. 609(A)(2).
[2] Evid.R. 609(B).
[3] R.C. 2919.22.
[4] See State v. Cornwell, 86 Ohio St.3d 560, 570,1999-Ohio-125, 715 N.E.2d 1144, citing State v. Smith (1984),14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[5] See State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293.
[6] See State v. Hart (1994), 94 Ohio App.3d 665, 671,641 N.E.2d 755.
[7] See State v. Smith, supra, at 14.
[8] See State v. Hill, 75 Ohio St.3d 195, 204, 1996-Ohio-222,661 N.E.2d 1068.
[9] See State v. Keenan (1993), 66 Ohio St.3d 402, 405,613 N.E.2d 203.
[10] See State v. Green, 90 Ohio St.3d 352, 373,2000-Ohio-182, 738 N.E.2d 1208.
[11] See State v. Slagle (1992), 65 Ohio St.3d 597, 605,605 N.E.2d 916.
[12] R.C. 2919.22.
[13] See State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
[14] See id.; State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717.
[15] See State v. Martin, supra.