DECISION. *Page 2 
{¶ 1} Following a jury trial, defendant-appellant Craig Tapke was convicted of the rape of a child under the age of ten,[1] the rape of a child under the age of 13,[2] and two counts of gross sexual imposition ("GSI")[3] of a child under the age of 13. He was acquitted of a third rape charge. The victim was his former live-in girlfriend's daughter, whom we refer to as D.S.
 {¶ 2} The trial court sentenced Tapke to life imprisonment, the mandatory sentence required for a rape conviction involving a child under the age of ten.[4] The trial court also imposed a ten-year prison term for the other rape conviction and a one-year prison term for each GSI conviction. The latter three sentences were made concurrent with the mandatory prison term. Finally, the trial court classified Tapke as a sexual predator.
 {¶ 3} Tapke now appeals his convictions, sentence, and classification status. He brings forth over ten assignments of error, claiming that he was denied a fair trial due to juror misconduct, prosecutorial misconduct, ineffective assistance of counsel, the admission of impermissible hearsay (medical records), the admission of his involuntary confession, and the trial court's refusal to allow the defense expert to give his opinion on whether Tapke's confession was false. He also maintains that his convictions were unsupported by the weight and the sufficiency of the evidence, and he challenges his sexual-predator classification and his sentence.
 {¶ 4} In most rape and child-sex-abuse cases, it comes down to the credibility of the witnesses-whom the jury believed. And while this trial may not *Page 3 
have been perfect, we cannot say that it was unfair. Therefore, we affirm Tapke's convictions and sentence.
 I. Sexual-Abuse Allegations and Confession {¶ 5} D.S.'s mother is Tammie Eubanks. Eubanks and Tapke once had a personal relationship, and they have a daughter, D.S.'s younger sister. D.S. also has a younger brother. At one point, all these people lived in the same house. In March 2005, when Tapke was no longer living with Eubanks and the children, D.S. told her mother that Tapke had raped and molested her for several years. Eubanks contacted the police and took D.S. to the emergency room at Cincinnati Children's Hospital, where D.S. was examined by a physician after a social worker had recorded a detailed history of the sexual abuse. D.S. was referred to the Mayerson Center at Children's Hospital, a unit that specializes in caring for child-sex-abuse victims. D.S. was again interviewed by the same social worker and examined by Dr. Robert Shapiro. As a result, Detective Ed Taylor of the Cheviot Police Department and Detective Bryan Peak of the Hamilton County Sheriffs Office ("HCSO") went to Tapke's place of employment, informed Tapke that there were allegations against him by D.S., and asked that he come to the HCSO for questioning. Tapke agreed and followed the detectives to the office.
 {¶ 6} After he arrived, Tapke signed a waiver form and made a tape-recorded statement, which we refer to as the confession, albeit a partial one.
 {¶ 7} Tapke confessed that on November 20, 2004, D.S. and his daughter had visited him at his residence. During the afternoon, he had agreed to take a nap with D.S. He stated that they had gone upstairs to his room and lain down on his bed, and that then he had put his hand on her belly region. He said that she had scooted up so that his hand had gone down her pants and touched her "privates." He said that *Page 4 
"privates" meant vagina. He also said that she had touched his penis. He admitted to having an erection. He then stated that he went to the bathroom and put on a condom because he was afraid that his body fluids would get on D.S. He said that he lay back down on the bed but became uncomfortable and left. He denied any penetration.
 {¶ 8} Tapke also stated that an uncomfortable incident had occurred when Tapke lived with Eubanks on Trevor Avenue. He stated that D.S. had straddled him while he was sitting on the couch and begun "grinding." Tapke said that he became aroused and pushed D.S. away. She was nine years old at the time.
 II. Motion to Suppress Confession {¶ 9} Tapke was arrested based on his confession and D.S.'s allegations that Tapke had (1) digitally and vaginally raped her during the time that D.S. and her mother had lived with Tapke; (2) raped her on August 7, 2003, when she and her siblings were left with Tapke and Tapke's mother and sister due to an emergency; and (3) raped her and touched her vagina on November 20, 2004, when she and her sister had gone to visit Tapke at his mother's house for the weekend.
 {¶ 10} Tapke moved to suppress his confession, arguing that it was coerced and was thus false. At the suppression hearing, Detective Peak was the only witness. He testified that Tapke was cooperative when he and Officer Taylor went to Tapke's place of employment to inform him of the allegations. He testified that Tapke agreed to come in for questioning and drove his own car to the HCSO. Tapke was placed in a small, windowless interview room, but the door was not locked. Peak testified that Tapke was given Miranda warnings and that he explained the waiver-of-rights form to Tapke, which he signed. He testified that the interview lasted approximately four hours, from 10:45 a.m. until 3:00 p.m. that day, but that only the last 30 minutes of the interview were tape-recorded. Tapke did not eat lunch or use the bathroom *Page 5 
during the interview, but Peak said that if he had asked, he would have been accommodated.
 {¶ 11} Detective Peak said that he had been trained to interview suspects using the Reid technique. Detective Peak stated that Tapke had initially denied the allegations. Finally, he testified that he had not threatened to arrest Tapke if Tapke did not come to the HCSO for questioning, although he believed that there was probable cause to arrest him at that time based on the allegations made by D.S.
 {¶ 12} The trial court determined that the confession was voluntary, noting that there had been no evidence of how the police had overcome Tapke's will. The motion to suppress was denied.
 III. The Trial {¶ 13} At trial, the state called as witnesses D.S., her mother, Tammie Eubanks, Detective Peak, and Robert Shapiro, M.D.
 {¶ 14} D.S. testified that she had lived with Tapke from the time she was in kindergarten through the third grade, on Trevor Avenue in Cheviot. When she was seven years old, she testified, Tapke began coming into her bedroom at night, at least two times a week. He would take her clothes off and wake her up. She testified that he had put his fingers and his penis inside her vagina, that it had hurt "pretty bad," and that she would feel "moisture" on her legs afterward.
 {¶ 15} She testified that Tapke had told her that if she told anyone about the incidents, then they would both go to jail. In March 2005, six months after the last incident, she confided in her cousin, who told her to inform her mother.
 {¶ 16} D.S. said that Tapke moved out of her home and lived with his parents on "Gilligan." She said that she went there with her siblings to stay one night because her mother was moving. She testified that, while she was there, she was in *Page 6 
Tapke's bedroom with him and that he put "jelly" from a "tube" on his fingers and put his fingers inside her vagina.
 {¶ 17} D.S. testified that she last had contact with Tapke right before Christmas in 2004. She testified that she was lying in bed with her sister, watching television, and that Tapke was lying on the floor. She said that Tapke asked her to come down to the floor, and that she heard a "wrapper." Tapke then went to the bathroom, returned, pulled her against him and said, "[D]on't worry, it's just a condom." She told him that she was tired and went to bed, lying between the wall and her sister.
 {¶ 18} When asked if Tapke had touched her that night, D.S. testified that she could not remember. The prosecutor then asked her if she remembered telling the "folks" at Children's Hospital what had happened to her. D.S. said "yes." The prosecutor then asked if it would help her to remember what had happened on November 20, 2004, if she reviewed what she had said in the interview. D.S. said "yes." She then read to herself a portion of the social worker's interview notes. After she was finished reading, she told the prosecutor that her memory was refreshed. But she still testified that she could not remember if Tapke had any physical, sexual contact with her that day.
 {¶ 19} Dr. Shapiro was a pediatrician and the medical director of the Mayerson Center for Safe and Healthy Children, the child-advocacy unit within Cincinnati Children's Hospital that specialized in caring for abused children. Dr. Shapiro testified that he had personally examined D.S. on March 21, 2005, after she had been referred by the emergency-room doctor who had examined D.S. the day before. Before the examination, a social worker from the Mayerson Center interviewed D.S. to record a detailed history of the sexual abuse. This was the same *Page 7 
social worker who had recorded D.S.'s history in the emergency room. Dr. Shapiro testified that, prior to examining D.S., he had reviewed the history recorded by the social worker so that he would know what to look for when examining D.S. and what laboratory tests to perform. He testified that he needed that information to medically treat D.S.
 {¶ 20} Dr. Shapiro testified that, when examining D.S., he did not find any "indications in her hymen, or anywhere in her external genitalia, or her rectum that indicated any healed or current trauma or infection." Dr. Shapiro indicated that it was normal for most children alleging sexual abuse to have a "normal" examination. He said that only6% of the 200 examinations he might perform each year indicated any physical sign of abuse. He testified that in most cases lacerations had time to heal before a child reported the abuse and was seen by a doctor. He also testified that scars on the hymen were quite rare. Ultimately, he testified that D.S.'s physical exam neither negated nor supported the allegations of sexual abuse.
 {¶ 21} During Dr. Shapiro's testimony, the state introduced D.S.'s medical records, which included the social worker's reports. Dr. Shapiro identified the medical records as accurate and indicated that they were kept in the ordinary course of business at the hospital. The records were admitted into evidence over a general objection by Tapke.
 {¶ 22} Tammie Eubanks testified that she and D.S. had lived with Tapke on Trevor Avenue from 1998 to 2002, and she identified Tapke as the man who had lived with her and D.S. She testified that she had left D.S. and her siblings with Tapke at his mother's house, on August 7, 2003, because she had to move. She testified that the last time D.S. was with Tapke was on November 20, 2004. Finally, she testified that she had a sexual relationship with Tapke and had not known him to *Page 8 
use condoms. Further, she testified that she had a conversation with Tapke about D.S. beginning menstruation just prior to D.S.'s visit to his house in November 2004.
 {¶ 23} Detective Peak's testimony at trial was similar to his testimony at the suppression hearing. He testified that Tapke had confessed, and the tape recording was played for the jury. Peak testified that he was one of the Hamilton County sheriffs deputies assigned to the Mayerson Center, but that he did not interview D.S. He said that the interviewing was left to the hospital social worker or a social worker affiliated with the 241-KIDS staff assigned to the hospital. Finally, he testified that the HCSO investigated child-sexual-abuse cases countywide.
 {¶ 24} Detective Ed Taylor testified that, during the four-hour interrogation, Detective Peak may have raised his voice at Tapke for 15 minutes, but that Peak did not threaten Tapke with harm.
 {¶ 25} In Tapke's defense, both his mother and his sister testified. They said that on August 7, 2003, Eubanks had left D.S. and her siblings at Tapke's residence on Gilligan because Eubanks had an emergency. Tapke's mother testified that Tapke was never alone with D.S., that Tapke and his sister went upstairs to go to bed, and that she stayed downstairs with D.S. until Eubanks returned.
 {¶ 26} With respect to the allegation of rape on November 20, 2004, both witnesses testified that Tapke was never alone with D.S., but that Tapke did take a nap with both D.S. and her sister. They both testified that they did not notice D.S. acting upset after the nap. Instead, they both indicated that she seemed excited because they were going ice skating that evening.
 {¶ 27} At trial, Tapke denied ever raping or touching D.S. in an inappropriate manner. He also said that he was coerced into confessing that on November 20, 2004, he had touched D.S. inappropriately, that he had a condom, and that she had *Page 9 
touched him. In explaining why he had given a false confession, he said that he was "beaten down" during the police interrogation. He explained that the police officers had berated him and yelled at him for at least two hours because he kept denying the allegations. He said that Detective Peak had threatened him with bodily harm and that Detective Taylor had to remove Detective Peak from the room. He testified that the officers had told him that "if you don't agree to any of this, then we're going to make sure you go to jail for the rest of your life [but] if you agree to any of this we'll go to bat for you, and we'll make sure the prosecutor knows you worked with us, and we'll help you in any way we can to get you out of this." He said that eventually he felt that he had to admit to something or that he was never going to leave the interview room.
 {¶ 28} Tapke testified that what had actually happened on November 20, 2004, was that D.S., her sister, and Tapke had all gone upstairs for a nap. He and D.S. were on the bed and D.S.'s sister was sitting in a chair watching television. He said that he woke up and D.S. had her pants pulled out, and that she was trying to put his hand down her pants. He said he jerked his hand away and left the room with D.S.'s sister. Later that evening, they all returned to the bedroom to watch a movie. Tapke was on the floor, and D.S. and her sister were in the bed, eating popcorn. Tapke said that he was eating candy. That was the "wrapper" that D.S. had heard. He denied ever putting on a condom.
 {¶ 29} On cross-examination, Tapke testified that during the interrogation the police had told him about all the allegations against him-the touching and raping of D.S.-before he confessed that he had touched D.S. on November 20, 2004. He also testified that he gave the confession after the police had conducted a voice-stress test and told him the results. *Page 10 
 {¶ 30} Richard Ofshe, Ph.D., a social psychologist, testified for the defense as an expert on police interrogation. He indicated that he had testified in approximately 243 cases throughout the United States on this issue. He said that he determined whether he wanted to testify in cases regarding a possible false confession after he had reviewed the interrogation and ascertained whether there was evidence to suggest that the defendant had not committed the crime. Ofshe was compensated for his testimony.
 {¶ 31} During his testimony, Ofshe gave an explanation of police interrogation. He said that the best way to elicit a reliable or true confession was for the interrogator to withhold some details about the crime when questioning the suspect. Therefore, if the suspect, in his confession, mentioned those details that only the perpetrator of the crime would have had knowledge of, then the confession was most likely true and thus reliable. But he said that, to employ this reliability test, it was usually necessary to review an interrogation that had been tape-recorded in its entirety so that a court could determine how much detail the police interrogator had given to the suspect before he confessed. Otherwise, Ofshe testified, in his opinion, the confession was meaningless.
 {¶ 32} Ofshe said that false confessions were often produced by psychological coercion. This was accomplished when the interrogator was able to create a sense of hopelessness in the suspect. And this was often done by employing the illegal method of either promising the suspect leniency in exchange for a confession or a greater penalty if the suspect did not confess. But, according to Ofshe, an interrogation technique had been created by the Reid Organization, a private police-interrogation training center, that attempted to circumvent appropriate interrogation techniques by training police interrogators on how to manipulate *Page 11 
suspects' perceptions of what would happen to them if they confessed. He testified as follows:
 {¶ 33} "So what police have learned to do is to communicate the message through a series of suggestions * * * the idea being to communicate the understanding that there's a deal on the table, but without ever explicitly saying here's the deal." He used the example of a person accused of GSI. He testified that the police would say something like this to a suspect: "[Y]ou're not a sexual predator; you're someone who needs treatment. What would you rather do, go to prison as a sex offender, or get some therapy in treatment."
 {¶ 34} In further explanation of the Reid technique, Ofshe testified that the interrogators were trained to do most of the talking to keep the suspect from denying the crime, and to suggest less culpable forms of the suspected offense. He testified that the Reid technique was highly controversial because it gave the impression of leniency even though a police officer was not permitted to promise leniency. This implied promise, combined with the suspect's feeling of hopelessness and the Reid-trained interrogators' role in doing most of the talking in an effort to keep the suspect from denying anything, often led to false confessions. On cross-examination, Ofshe could not quantify the amount of false confessions nationally.
 {¶ 35} The jury acquitted Tapke of the rape charge based on the events that had occurred on August 7, 2003. He was convicted of the remaining offenses. A new-trial motion was denied. Tapke was sentenced and classified as a sexual predator.
 IV. Juror Misconduct {¶ 36} In his first three assignments of error, Tapke claims that he was denied a fair trial because (1) jurors had slept during the trial and one juror had approached *Page 12 
Tapke, mistaking him for the prosecutor; (2) the trial court had failed to determine what portions of the trial the sleeping jurors had missed; and (3) defense counsel had failed to observe the jurors sleeping and to bring it to the trial court's attention.
 {¶ 37} It is well established that "[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct and the appropriate remedies for any demonstrated misconduct."[5] Further, a trial court has "considerable discretion in deciding how to handle a sleeping juror."[6]
 {¶ 38} Here, before sentencing, several members of Tapke's family submitted letters that indicated that a juror had been sleeping during the trial. Tapke's mother specifically identified the sleeping juror as the foreman of the jury. The trial court made these letters part of the record. The trial court then stated that it had been in the jury room following the announcement of the verdict and had noticed that the jury had taped charts on the wall that reflected a methodical review of the evidence.
 {¶ 39} Tapke argues that the trial court should have inquired into whether the claim that jurors were sleeping was true, and if they had been, what portions of the trial the sleeping jurors had missed. But Tapke did not request this at sentencing and expressed no dissatisfaction with the trial court's handling of the matter. Thus, in the absence of plain error, this claim has been waived.
 {¶ 40} Here, no plain error occurred. There were simply vague allegations from Tapke's family that a juror or jurors had been sleeping during the trial, and those allegations came only after the verdict had been read and the jury had been dismissed, prior to sentencing. Neither the trial court, the prosecutor, nor defense counsel had noticed any sleeping jurors. And the trial court believed that the jury had methodically reviewed the evidence. Under these circumstances, we cannot say that the trial court *Page 13 
abused its discretion in failing to further inquire into jurors sleeping, and thus there was no plain error.
 {¶ 41} With respect to the juror approaching Tapke, we note that this was brought to the trial court's attention, and that it was determined that nothing about the trial had been discussed. In fact, Tapke had not responded to the juror. Therefore, there was no error in allowing this juror to remain on the panel.
 {¶ 42} Finally, Tapke argues that his trial counsel was ineffective for not noticing the sleeping jurors. But reversal of a conviction based upon the ineffective assistance of counsel requires a showing by the defendant that his counsel's performance was deficient and that he was prejudiced by the deficiency.[7] We cannot say in this case that defense counsel's performance was deficient. There is no evidence in the record that defense counsel was made aware of sleeping jurors and then chose not to inform the trial court.
 {¶ 43} We overrule Tapke's first three assignments of error.
 V. Self-lncrimination {¶ 44} In his fourth assignment of error, Tapke contends that the trial court erred by overruling his motion to suppress his confession, by admitting it into evidence, and by playing it for the jury.
 {¶ 45} With respect to the motion to suppress, we note that only Detective Peak testified at the suppression hearing; Tapke did not. Although Tapke argued at the hearing that his confession was involuntary because he had been coerced, the trial court found that there was no evidence demonstrating how the police officers had overcome Tapke's will and forced him to confess. *Page 14 
 {¶ 46} We review the voluntary nature of Tapke's confession under a totality-of-the-circumstances standard.[8] The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[9] Absent evidence that a defendant's will was overborne and that his capacity for self-determination was critically impaired because of coercive police conduct, the decision of a suspect to waive his Fifth Amendment privilege is considered voluntary.[10]
 {¶ 47} Although both parties have argued about evidence that was presented at trial, we may only consider and review the evidence that was presented at the suppression hearing.
 {¶ 48} At the hearing, it was established that Tapke was cooperative with the police, had agreed to talk with them, and had driven himself to the HCSO. Once there, he was informed of his Miranda rights and signed a waiver form that explained those rights. A copy of the taped confession presented at the hearing verified that Tapke had been informed of hisMiranda rights. Detective Peak testified that there was no indication that Tapke was under the influence of alcohol or drugs, and that he appeared mentally competent and was able to read and write. Although the interview lasted four hours and Tapke did not use the bathroom or eat during that time, we cannot say that his will was overcome, in light of the fact that Tapke only confessed to a "touching" of D.S. and continued to deny any rape allegations. (Detective Peak testified that Tapke had been informed of the allegations D.S. had made before he confessed.) *Page 15 
 {¶ 49} Once the trial court has determined that a confession has been made voluntarily, it is properly admitted at trial, and the trier of fact has the responsibility to determine how much weight to give it. Further, we find no error in playing the tape for the jury and admitting the transcript into evidence.[11] Accordingly, we overrule the fourth assignment of error.
 VI. Expert Testimony {¶ 50} In his fifth assignment of error, Tapke claims that the trial court erred in refusing "to permit the defense expert to testify to his opinion that the statement was a false confession."
 {¶ 51} At trial, Tapke's counsel asked Ofshe if the jury could "reconcile" Tapke's description of the interrogation with Detective Peak's description. The trial court sustained the state's objection, noting that "[i]t's the jury's province, solely, to determine [whether it's a false confession]." Ofshe then was allowed to testify about how to determine whether a confession was false.
 {¶ 52} The Ohio Supreme Court has held that "while testimony on an ultimate issue to be decided by the trier of fact is not per se inadmissible in Ohio, it is within the sound discretion of the trial court to refuse to admit the testimony of an expert witness on an ultimate issue where such testimony is not essential to the jury's understanding of the issue and the jury is capable of coming to a correct conclusion without it."[12]
 {¶ 53} Here, Ofshe's opinion on whether Tapke's confession was false was not essential to the jury's understanding of the issue, particularly in light of Ofshe's extensive testimony on how to determine whether a confession was false. The issue *Page 16 
was one of Tapke's credibility, and this was the jury's province.[13]
Here, the jury was able to hear Tapke's confession on tape, to note his voice intonations, and to consider the testimony of Tapke, Detective Peak, and Detective Taylor regarding the interrogation. The jury had ample opportunity to evaluate the credibility of Tapke and to give the confession its appropriate probative weight.
 {¶ 54} We note that Ofshe testified extensively about the Reid technique — and the jury had an appropriate basis for not believing the confession. But it chose not to discredit it.
 {¶ 55} Accordingly, because the jury had an ample opportunity to evaluate the credibility of the confession, the trial court did not abuse its discretion by excluding Ofshe's opinion on whether Tapke's confession was false. The fifth assignment of error is overruled.
 VII. Let the Jury Decide {¶ 56} In his sixth assignment of error, Tapke maintains that the trial court erred by taking judicial notice that one or more of the elements of the charged offenses had occurred in Hamilton County, Ohio. Tapke argues that this violated his due-process rights by relieving the state of proving venue beyond a reasonable doubt. Because Tapke did not object to the court taking judicial notice, we review this assignment for plain error.
 {¶ 57} Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In construing this rule, the Supreme Court of Ohio has stated that "notice of plain error * * * is to be taken with the utmost caution, under exceptional *Page 17 
circumstances and only to prevent a manifest miscarriage of justice."[14] Plain error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been otherwise.[15]
 {¶ 58} Unless waived by the defendant, venue is a fact that must be proved in every criminal case beyond a reasonable doubt even though it is not an element of the offense.[16] Here, during her direct examination, D.S. testified that Tapke had raped her when she lived with him and her mother in the house on Trevor Avenue in Cheviot. The prosecutor then asked her if she knew whether Cheviot was in Hamilton County. D.S. responded, "I have no idea." The trial court then said, in the presence of the jury, "The court will take judicial notice that Cheviot's in Hamilton County." This was an error, as this court has held that a trial court may only take judicial notice "that the geographical area of its jurisdiction, such as a county, contains a named street or a certain portion thereof," when it is sitting "without a jury."[17]
Taking judicial notice of venue in the presence of a jury usurps the jury's responsibility to determine that the charged offense occurred in the place alleged. But we hold that in this case the court's action did not amount to plain error, because there was ample evidence to establish venue.
 {¶ 59} Venue need not be shown by direct evidence, but may be proved by the evidence as a whole or by circumstantial evidence.[18] Thus, venue is established where the testimony justifies the reasonable inference that the violation occurred at the place alleged in the indictment. In State v. North College Hill,[19] this court held *Page 18 
that venue in Hamilton County, Ohio, was established when the evidence demonstrated that the crime had occurred on Bake Avenue in North College Hill, and when the defendant had appealed his conviction from the Mayor's Court of North College Hill to the Hamilton County Municipal Court. In State v. Elliott,[20] the Fourth Appellate District held that there was sufficient circumstantial evidence to support a finding of venue in Ross County, Ohio, when the victim testified that the rape had occurred at the residence where she lived with the defendant, and when the investigating officer testified that the residence was in Greenfield, Ohio, and that he worked for the Ross County Sheriffs Office.
 {¶ 60} Here, the victim and her mother testified about the street name and the city where the rape had occurred. The investigating officer, Detective Bryan Peak, testified that he was employed by the HCSO and that he investigated cases of child sexual abuse. On cross-examination, he further testified that the "Sheriffs Department" handled cases countywide. Upon viewing the evidence in a light most favorable to the state, we hold that venue was sufficiently established in Hamilton County, Ohio. But we caution the state in attempting to establish venue in this manner. The more prudent method would be by direct question and answer. The sixth assignment of error is overruled.
 {¶ 61} In his seventh assignment of error, Tapke argues that the trial court erred by instructing the jury that "[i]t's obvious [D.S.] was not [Tapke's] spouse." Tapke argues that this violated his Sixth Amendment right to have the jury determine that this element of the charged offenses had been proved by the state beyond a reasonable doubt. *Page 19 
 {¶ 62} Because Tapke did not object to the trial court's instructions, any error that may have occurred has been waived absent the existence of plain error.
 {¶ 63} The record before us fails to substantiate Tapke's suggestion of plain error. While we agree that it was erroneous for the trial court to invade the province of the jury by essentially instructing the panel that an element of the charged offenses had been proved, we cannot say that the outcome of the trial clearly would have been otherwise if not for this error. We hold that the evidence clearly showed that the victim was not Tapke's spouse.
 {¶ 64} Here, D.S. testified that she was 13 years old at the time of trial, and that Tapke had been her mother's boyfriend and was her sister's father. Tapke testified that he was in essence D.S.'s step-father and that he and D.S. had only lived in the same residence while he was dating D.S.'s mother. We hold that this evidence clearly proved that D.S. was not Tapke's spouse.[21] But again, we caution the state that the more prudent approach is by direct question and answer. The seventh assignment of error is overruled.
 VIII. Hearsay {¶ 65} In his eighth assignment of error, Tapke argues that the trial court erred (1) by allowing the victim to refresh her recollection with a written document prepared by a social worker; (2) by allowing into evidence the victim's medical records, which contained statements that the victim had made to a social worker, who did not testify at trial; and (3) by allowing D.S. to testify about a conversation she had with her cousin. *Page 20 
 {¶ 66} Tapke argues that D.S. should not have been allowed to refresh her recollection, under Evid.R. 612, from a written document prepared by the social worker who had interviewed D.S. at the hospital, but who did not testify at trial. Upon review of the record, we hold that there was no error. Evid.R. 612 does not require that the document used to refresh the witness's recollection be one actually prepared by the witness.[22]
 {¶ 67} Next, Tapke argues that the court erred in admitting D.S.'s medical records, which contained the social worker's report, into evidence. Citing Crawford v. Washington,[23] Tapke contends that the medical records contained testimonial statements made by the social worker and that these statements were admitted into evidence in violation of his constitutional rights under the Confrontation Clause, as the social worker did not testify at trial and Tapke did not have a prior opportunity to cross-examine her.
 {¶ 68} The Sixth Amendment's Confrontation Clause guarantees that "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In Crawford, the United States Supreme Court held that out-of-court statements that are testimonial in nature are barred under by the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court.[24] Therefore, the threshold issue we must determine is whether the statements in the social worker's report were testimonial.[25] *Page 21 
 {¶ 69} While the Supreme Court in Crawford did not provide an exact definition of the term, it noted that, at a minimum, "testimonial" statements include prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and statements made during police interrogations.[26] The Ohio Supreme Court has held that a testimonial statement includes one made "under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[27]
 {¶ 70} Before applying Crawford to the facts in this case, we need to specify who the out-of-court declarant was in the social worker's report. Tapke argues that the report was made up of statements by the social worker. But a review of the social worker's report reveals that it was a summary of D.S.'s statements made during the interview. Almost each sentence of the report begins with the words "Patient states * * *." Dr. Shapiro testified that these statements made by D.S. to the social worker during the interview were reviewed by him for purposes of diagnosing and treating D.S. Therefore, we review the sentences in the report that begin with "Patient states" as out-of-court statements made by D.S., not by the social worker.
 {¶ 71} Although Tapke objected to the admission of the medical records at trial, he did not state his reason. Based on his argument with respect to the social worker's report, it appears that he was objecting to all the statements that D.S. made to the social worker. But based on the context of his argument in his appellate brief, it appears that he is most concerned that D.S. told the social worker that on November 24, 2004, "[Tapke] woke her up and put his hands in her privates." At trial, D.S. could not recall if any sexual conduct had occurred on that date. While we *Page 22 
have only noted this particular statement, all of D.S.'s statements concerned the sexual abuse she had suffered.
 {¶ 72} Turning to D.S.'s statements, we note that, in general, courts have held that statements made by child-abuse victims to medical providers are not testimonial in nature.[28] But most of those cases involved children who were younger than D.S. Regardless, in State v.Stahl,[29] the Ohio Supreme Court held that statements by an adult victim of sexual assault identifying her assailant to a nurse practitioner were nontestimonial.[30] The court noted that although the victim had been seen by a nurse in a specialized medical facility for sexual-assault victims and that that facility assisted in gathering evidence for criminal prosecution, the unit's primary purpose was the care of its patients. Thus, statements made in the course of that care could not have objectively been believed to be for trial and were, consequently, not testimonial.[31]
 {¶ 73} Like the victim in Stahl, after informing the police and her parents of the sexual abuse, D.S. went to the emergency room, where the social worker interviewed her prior to her examination. Since D.S. had made her statements during an emergency-room examination, an objective witness would have believed that any statements made were for health-related reasons and not for use later at trial. We note that the social worker took D.S.'s history again at the Mayerson Center, which was the part of Children's Hospital specializing in child sexual abuse, after the emergency-room doctor had referred D.S. to the center. But, again, the *Page 23 
primary purpose of this history was to assist Dr. Shapiro in his medical examination of D.S.
 {¶ 74} Because there is no evidence of record that D.S. could have objectively believed that her statements would be available for use at a later trial, we hold that her statements were not testimonial. Even assuming arguendo that her statements were testimonial, we note that D.S. was called to testify at trial, providing Tapke with the opportunity to cross-examine her regarding the statements that formed the basis for the medical records and thus comporting with the standards for admissibility under Crawford. "When the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of prior testimonial statements."[32]
 {¶ 75} Next, Tapke argues that the trial court erred in allowing D.S. to testify about a conversation she had with her cousin. We find no error in this instance. The trial court generally has broad discretion in the admission or exclusion of evidence, and in the absence of an abuse of discretion that results in material prejudice to a defendant, an appellate court should be slow to overturn evidentiary rulings.[33]
Here, D.S. testified that she had told her cousin about the abuse and that her cousin told her to "tell [D.S.'s] mom." Tapke has not shown how the admission of this evidence resulted in material prejudice to Tapke. The eighth assignment of error is overruled.
 IX. Prosecutorial Misconduct Absent {¶ 76} In his ninth assignment of error, Tapke maintains that he was denied a fair trial due to prosecutorial misconduct. Specifically, Tapke claims the prosecutor *Page 24 
(1) improperly stated in opening argument that the evidence would demonstrate anal penetration, when it did not; (2) used impermissible hearsay to prove penetration for the third count of rape; (3) told the jury that the defendant had lied to the jury; and (4) referred to the defense's expert as a "so-called expert."
 {¶ 77} To demonstrate prosecutorial misconduct, the defendant must show that the prosecutor's actions were improper and that prejudice arose from the misconduct.[34] Because Tapke did not object to the comments that the prosecutor made, we review the proceedings for plain error. Under the plain-error standard, we will not reverse in this case unless we are convinced that Tapke would not have been found guilty but for the alleged misconduct.
 {¶ 78} After reviewing the record, we hold that it was not improper for the prosecutor to inform the jury during opening argument that the evidence would show anal penetration even though the victim did not actually testify that this had occurred. Opening argument is not evidence,[35] and the jury was instructed so in this case. Further, the medical records indicated a possibility of anal penetration, so we cannot say that the prosecutor acted in bad faith in mentioning this in opening argument. We note that the prosecutor did not argue anal penetration in his closing argument, and any reference to it was removed from the final jury instructions. And if the prosecutor's conduct was improper, Tapke has not demonstrated how it changed the outcome of his trial.
 {¶ 79} Tapke next argues that it was improper for the prosecutor to use the hearsay in the medical records to establish penetration of D.S. by Tapke on November 20, 2004. But as we have already held that the medical records, which *Page 25 
included the statements D.S. had made to the social worker, were properly admitted, we find no error in the prosecutor's conduct in this respect.
 {¶ 80} Tapke also claims that the prosecutor told the jurors that Tapke had lied to them. Tapke cites to page 663 of the trial transcript, but that page contains jury instructions, so we presume that he means page 662, which is the end of the prosecutor's closing argument. At that point, the prosecutor told the jury that D.S. had no reason to lie, but that Tapke "has every reason to, not only when he talked to those police detectives and gave his half-hearted story, and blamed it on that kid, then to come in here today and tell you, I lied then, but I'm telling you the truth now."
 {¶ 81} We hold that these comments were proper, as they were remarks concerning the credibility and truthfulness of Tapke based on his testimony.[36] The prosecutor did not call Tapke a liar, but inferred from Tapke's testimony that Tapke had reason to lie. The prosecutor also directed the jury's attention to the fact that Tapke had retracted his confession and thus changed his story at trial.
 {¶ 82} Finally, Tapke insists that the prosecutor denigrated the defense's expert witness, Ofshe, by (1) referring to him as a "so-called expert;" (2) referring to the fact that he was being paid $5,000 for his services; and (3) mentioning that Ofshe went around the country testifying.
 {¶ 83} We find nothing improper about the prosecutor's reference to the expert's compensation and the comment that he testified nationally, when these facts were in evidence. But we hold that the "so-called expert" remark was unprofessional *Page 26 
and improper. But in the context of the entire closing argument, we cannot say that this amounted to prejudicial misconduct or plain error.[37]
 {¶ 84} We overrule the ninth assignment of error.
 X. Sufficiency and Weight of the Evidence {¶ 85} In his tenth and eleventh assignments of error, Tapke contests the sufficiency and the weight of the evidence underlying his convictions. In his twelfth assignment of error, Tapke maintains that the trial court erred in denying his Crim.R. 29 motion for an acquittal. For the following reasons, we overrule all three assignments of error.
 {¶ 86} When reviewing the denial of a Crim.R. 29 motion, this court employs the same standard of review used in reviewing a challenge to the sufficiency of the evidence.[38] We must determine "[w]hether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt."[39] When reviewing a challenge to the manifest weight of the evidence, this court sits as a "thirteenth juror."[40]
We review the record, weigh the evidence, consider the credibility of witnesses, and determine whether the jury clearly lost its way and created a manifest miscarriage of justice.[41]
 {¶ 87} R.C. 2907.02(A)(1)(b), Ohio's rape statute, provides, "[N]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the *Page 27 
offender knows the age of the other person." "Sexual conduct" means "vaginal intercourse * * * and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the [vagina]."[42]
 {¶ 88} R.C. 2907.05(A)(4) proscribes gross sexual imposition: "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender to have sexual contact with the offender * * * when * * * "the other person is less than thirteen years of age." "Sexual contact" means "any touching of an erogenous zone of another * * * including * * * the thigh, genitals [and] pubic region."[43]
 {¶ 89} Our review of the record leads us to conclude that the state presented sufficient evidence that Tapke had raped and inappropriately touched D.S. in a sexual manner during the time that she lived with him and her mother on Trevor Avenue, and on November 20, 2004.
 {¶ 90} D.S. testified that she had lived with Tapke and her mother from the time she was in kindergarten through the third grade on Trevor Avenue in Cheviot. She said that, during that time, Tapke would enter her bedroom late at night, remove her clothes, and place his fingers, and sometimes his penis, inside her vagina, which she described as hurting "pretty bad." She also testified that she felt moisture on her legs afterwards. Although Tapke argues that D.S. never identified him as her assailant, we cannot say that this is an appropriate basis for reversal when D.S. referred to Tapke by name as her assailant, and when her mother identified Tapke as the man whom she and D.S. had lived with on Trevor Avenue. *Page 28 
 {¶ 91} Tapke also maintains that there was no evidence offered by the state that he had raped or had sexual contact with D.S. on November 20, 2004. He notes that D.S. testified that she could not remember any sexual contact on that date. But Tapke's confession that he touched D.S. in her pubic region, that she touched his penis, and that he was aroused was admitted into evidence during the state's case. Further, D.S.'s medical records were admitted into evidence, and they contained the social worker's report. The report said, "[P]atient states the last incident happened about 6 months ago when she went on a visit [with] her sister. Patient states she was in the bed [with] her sister * * * Patient states [Tapke] woke her up and put his hands in her privates * * * Patient states she was able to wedge herself between the wall and her sister and `nothing else happened.'" (In the report, patient was abbreviated "pt." Dr. Shapiro testified that "pt" meant "patient.")
 {¶ 92} Tapke also argues that there was no evidence to support the element of "force." But the Ohio Supreme Court has held that "a person in a position of authority over a child less than thirteen may be convicted of rape of that child with force pursuant to R.C.2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint."[44] Here, we note that D.S. testified that Tapke had removed her clothing when he raped her. Further, both Tapke and D.S. testified that because Tapke had lived with her mother and was the biological father of her sister, they had a relationship similar to that of a step-parent and a stepchild. Finally, D.S. testified that Tapke had told her not to tell anyone about what they were doing; otherwise they would both go to jail. We hold that this evidence was sufficient to support the jury's finding of "force." *Page 29 
 {¶ 93} Tapke insists that "it defies rational belief" that D.S. was raped by an adult man, yet her hymen suffered no lacerations and was still intact. But Dr. Shapiro testified that his findings from D.S.'s physical examination did not negate a finding of sexual abuse. In fact, he testified that most victims of child sexual abuse had "normal" examinations.
 {¶ 94} Next, Tapke argues that it was irrational for the jury to acquit Tapke of the August 2003 rape charge but to find him guilty of the other rape charges. Tapke presumes that, to acquit on the one charge, the jury had to have concluded that D.S. was a "liar." Not necessarily so. Given that Tapke had confessed to some sexual touching on November 20, 2004, and admitted in his confession to some inappropriate behavior at Trevor Avenue, the jurors may have thought that he was less than credible but believed that they had no choice but to acquit him for the August charge, because his mother had testified that Tapke was never alone with D.S. on that date. Regardless, considering the evidence presented, including the expert's testimony regarding how to determine whether a confession was false, we cannot say that the jury lost its way in finding Tapke guilty of two counts of rape and two counts of gross sexual imposition.
 {¶ 95} Accordingly, we conclude that Tapke's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, and that the trial court did not err in denying his Crim.R. 29 motion for an acquittal. The tenth, eleventh, and twelfth assignments of error are overruled.
 XI. Trial Counsel Was Not Ineffective {¶ 96} In his thirteenth assignment of error, Tapke maintains that he received ineffective assistance of counsel at trial. He claims that his trial counsel should have *Page 30 
objected to the prosecutor's misconduct, the juror misconduct, and the trial court's judicial notice of venue. We have already held that there was no prejudicial error with respect to any of these issues. Accordingly, we hold that trial counsel's performance was not deficient. The thirteenth assignment of error is overruled.
 XII. Sexual-Predator Classification {¶ 97} In his fourteenth assignment of error, Tapke contends that the trial court erred in finding him to be a sexual predator. At the sexual-predator-classification hearing, the trial court considered the presentence-investigation report, the victim-impact statements, the arresting officers' statements, and the court clinic's evaluation, which indicated that Tapke tested at a "low" risk rate for recidivism.
 {¶ 98} A sexual predator is defined as a "person who has been convicted of or pleaded guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses."[45] We conclude from our review of the record that there was sufficient evidence to support the trial court's adjudication of Tapke as a sexual predator. Although the Static-99 test indicated that Tapke had a low risk to reoffend, and his three prior convictions did not involve sex offenses, he had repeatedly raped the young daughter of his live-in girlfriend over a two-to-three-year period and had confessed to having sexual contact with the young girl. The nature of the conduct and the age of the victim clearly weighed in favor of the trial court's classification. We overrule the fourteenth assignment of error. *Page 31 
 XIII. New Trial? {¶ 99} In his fifteenth assignment of error, Tapke maintains that the trial court erred in denying his motion for a new trial. Tapke incorporates his arguments presented under his other assignments of error and claims that his trial was unfair. Because we have already held otherwise, we overrule this assignment of error.
 {¶ 100} And we also overrule Tapke's final assignment of error, in which he maintains that the effect of cumulative error denied him a fair trial and thus that his convictions and sentences were improper. Tapke has not demonstrated any prejudicial error in the trial court's proceedings.
 {¶ 101} Accordingly, we affirm Tapke's convictions, his sentences, and his sexual-predator classification.
Judgment affirmed.
HILDEBRANDT and SUNDERMANN, JJ., concur.
[1] R.C. 2907.02(A)(1)(b) and (B);
[2] R.C. 2907.02(A)(1)(b).
[3] R.C. 2907.05(A)(4).
[4] See R.C. 2907.02(A)(1)(b) and (B); R.C. 2971.03(A)(2).
[5] State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046,837 N.E.2d 315, at ¶ 24.
[6] State v. Sanders, 92 Ohio St.3d 245, 253, 2001-Ohio-189,750 N.E.2d 90.
[7] Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052;State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
[8] State v. Clark (1988), 38 Ohio St.3d 252, 261,527 N.E.2d 844.
[9] In re Watson (1989), 47 Ohio St.3d 86, 90, 548 N.E.2d 210, quotingState v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus.
[10] State v. Dailey (1990), 53 Ohio St.3d 88, 91-92,559 N.E.2d 459.
[11] See Evid.R. 1002; State v. Fitzgerald, 9th Dist. No. C.A. 23072,2007-Ohio-701.
[12] Bostic v. Conner (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph three of the syllabus.
[13] State v. Jamison (1990), 49 Ohio St.3d 182, 191,552 N.E.2d 180.
[14] State v. Long (1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804.
[15] State v. Joseph (1995), 73 Ohio St.2d 450, 455,653 N.E.2d 285.
[16] State v. Draggo (1981), 65 Ohio St.2d 88, 90, 418 N.E.2d 1343;State v. Gardner (1987), 42 Ohio App.3d 157, 158, 536 N.E.2d 1187.
[17] State v. Bunch (July 11, 1979), 1st Dist. No. C-780578; see, also, Middleburg Heights v. Milner (July 6, 2000), 8th Dist. No. 76499, citing State v. Collins (1977), 60 Ohio App.2d 116, 125,396 N.E.2d 221.
[18] State v. Gribble (1970), 24 Ohio St.2d 85, 263 N.E.2d 904.
[19] (Feb. 2, 1983), 1st Dist. No. C-820231
[20] 4th Dist. No. 06CA2924, 2007-Ohio-2178.
[21] See State v. Bloomfield (June 7, 2006), 1st Dist. Nos. C-040453 and C-040898.
[22] State v. O'Keefe, 11th Dist. Nos. 2002-A-0015 and 2002-A-0048,2004-Ohio-5300.
[23] (2004), 541 U.S. 36, 124 S.Ct. 1354.
[24] Id. at 68.
[25] State v. Crager, 164 Ohio App.3d 816, 2005-Ohio-6868,844 N.E.2d 390, at ¶ 28.
[26] Crawford, supra, at 68.
[27] State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482,855 N.E.2d 834, citing Crawford, supra, at 68.
[28] See, e.g., State v. Sheppard, 164 Ohio App.3d 372,2005-Ohio-6065, 842 N.E.2d 561, at ¶ 30; In re D.L., 8th Dist. No. 84643, 2005-Ohio-2320, ¶ 20.
[29] See Stahl, supra.
[30] Id.
[31] Id. at 196-197, 2006-Ohio-5482, ¶ 39-40.
[32] See Crawford, supra, at 59.
[33] Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66,567 N.E.2d 1291.
[34] See State v. Lewis, 1st Dist. Nos. C-050989 and C-060010,2007-Ohio-1485, ¶ 16.
[35] State v. Turner (1993), 91 Ohio App.3d 153, 631 N.E.2d 203.
[36] See State v. Little (May 7, 2004), 1st Dist. No. 030432,2004-Ohio-2279.
[37] See State v. Ward (Mar. 2, 2001), 2nd Dist. No. C.A. 18211.
[38] See State v. Jordan, 167 Ohio App.3d 157, 2006-Ohio-2759,854 N.E.2d 520, at ¶ 49.
[39] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[40] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[41] Id.
[42] R.C. 2907.01(A).
[43] R.C. 2907.01(B).
[44] State v. Dye, 82 Ohio St.3d 323, 1998-Ohio-234, 695 N.E.2d 763, syllabus.
[45] R.C. 2950.01(E). *Page 1